**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

| | |
|---|---|
| COLD STONE CREAMERY, INC., | : |
| An Arizona Corporation, and | : |
| COLD STONE CREAMERY LEASING | : |
|   COMPANY, INC., | : |
| An Arizona Corporation, | : |
| | : |
|           Plaintiffs, | : |
| | : |
|      v. | :   C.A. No.  07-CV-6705 (SCR) |
| | : |
| BLUE ICE CREAMERY, INC, | : |
| A New York Corporation, | : |
| STARRY NIGHTS, INC, | : |
| A New York Corporation, | : |
| THE STONE AT LYNBROOK, INC, | : |
| A New York Corporation, | : |
| SPARKY'S DELIGHTS, INC, | : |
| A New York Corporation, | : |
| THE STONE AT MELVILLE, INC, | : |
| A New York Corporation, | : |
| MARC MANDELBAUM, | : |
| A Resident of the State of New York, | : |
| ROY MANDELBAUM, | : |
| A Resident of the State of New York, | : |
| ERIC LEVINE, | : |
| A Resident of the State of New York, | : |
| KAREN LEVINE, | : |
| A Resident of the State of New York, and | : |
| AMY GREENBERG, | : |
| A Resident of the State of New York, | : |
| | : |
|           Defendants. | : |

------------------------------------------------------------------x

<u>**COMPLAINT**</u>

     This is an action for injunctive relief and money damages based on Defendants' breaches

of the Franchise Agreements, Subleases, Promissory Notes and other agreements between the

parties, along with the continued unauthorized operation of three Cold Stone Creamery® ("Cold

Stone Creamery) franchises by Defendants Starry Nights, Inc., Sparky's Delights, Inc., The

Stone at Melville, Inc., Marc Mandelbaum, Roy Mandelbaum, Eric Levine, Karen Levine, and Amy Greenberg following the termination of those agreements.

Defendants have failed to comply with their legal obligations under numerous Franchise Agreements, Subleases, and Promissory Notes and have amassed a collective debt of approximately $900,000. Based on Defendants' financial defaults, underreporting, and violations of tax laws, Plaintiffs terminated the Franchise Agreements and Subleases. Despite the terminations, Defendants continue to hold themselves out to the general public as if they are authorized Cold Stone Creamery franchisees, continue to operate under the Cold Stone Creamery trademarks and trade name, and continue to sell Cold Stone Creamery products. Plaintiffs file this lawsuit to protect their rights and to enjoin Defendants' ongoing, unauthorized use of the Cold Stone Creamery trademarks and trade name.

## THE PARTIES

1.      Plaintiff Cold Stone Creamery, Inc. ("Cold Stone Creamery") is an Arizona corporation with its principal place of business at 9311 East Via De Ventura, Scottsdale, Arizona 85258. It is engaged in the business of franchising independent businesspersons to operate Cold Stone Creamery retail ice cream stores throughout and outside of the United States. Cold Stone Creamery franchisees are licensed to use the trade names, service marks, and trademarks of Cold Stone Creamery and operate under the Cold Stone Creamery System, which involves the production, merchandising, and sale of ice cream and related products utilizing a specially-designed building with special equipment, equipment layouts, interior and exterior accessories, identification schemes, products, management programs, standards, specifications, proprietary marks, and information. Cold Stone Creamery is the also the promisee for two promissory notes signed by Defendants.

2.      Plaintiff Cold Stone Creamery Leasing Company, Inc. ("Cold Stone Creamery Leasing") is an Arizona corporation with its principal place of business at 9311 East Via De Ventura, Scottsdale, Arizona 85258.   Cold Stone Creamery Leasing is a wholly owned subsidiary of Cold Stone Creamery and is engaged in the business of leasing properties to Cold Stone Creamery franchisees to enable Cold Stone Creamery to franchise independent businesspersons to operate Cold Stone Creamery stores at those locations.   Cold Stone Creamery Leasing is the lessee and the sublessor for the Cold Stone Creamery stores currently and formerly operated by Defendants in Lake Grove, Westbury, Woodbury, Roslyn, Lynbrook, Huntington, Plainview, and Huntington Station, New York.

3.      Defendant Blue Ice Creamery, Inc. is a New York Corporation with its principal place of business at 3 Candor Drive, Woodbury, New York 11797.   Blue Ice Creamery, Inc. was previously the owner and operator of a Cold Stone Creamery franchise located at 11 Wall Street, Huntington, New York 11743 (the "Huntington Store").   Defendant Blue Ice Creamery, Inc. was previously a franchisee for the Huntington Store pursuant to a Transfer Agreement dated June 20, 2003 (the "Huntington Transfer Agreement").   The Huntington Store opened for business on or about August 10, 2004.

4.      Defendant Starry Nights, Inc. is a New York Corporation with its principal place of business at 3 Candor Drive, Woodbury, New York 11797.   At all times relevant to this action, Starry Nights, Inc. was the owner and operator of a Cold Stone Creamery franchise located at 7959 Jericho Turnpike, Woodbury, New York 11797 (the "Woodbury Store").   Defendant Starry Nights, Inc. was a franchisee for the Woodbury Store pursuant to a Transfer Agreement dated March 23, 2007 (the "Woodbury Transfer Agreement").   The Woodbury Store opened for business on or about April 25, 2003.

5.     Defendant The Stone at Lynbrook, Inc. is a New York Corporation with its principal place of business at 3 Candor Drive, Woodbury, New York 11797.  The Stone at Lynbrook, Inc. was previously the owner and operator of a Cold Stone Creamery franchise located at 6 Broadway, Lynbrook, New York 11563 (the "Lynbrook Store").  Defendant The Stone at Lynbrook, Inc. was a franchisee for the Lynbrook Store pursuant to a Transfer Agreement dated March 11, 2004 (the "Lynbrook Transfer Agreement").

6.     Defendant Sparky's Delights, Inc. is a New York Corporation with its principal place of business at 3 Candor Drive, Woodbury, New York 11797.   At all times relevant to this action, Sparky's Delights, Inc. was the owner and operator of a Cold Stone Creamery franchise located at 2194 Nesconset Highway, Lake Grove, New York 11790 (the "Lake Grove Store").  Defendant Sparky's Delights, Inc. was a franchisee for the Lake Grove Store pursuant to a Transfer Agreement dated April 28, 2003 (the "Lake Grove Transfer Agreement").  Defendant Sparky's Delights, Inc. was a sublessee for the property located at 2194 Nesconset Highway, Lake Grove, New York, pursuant to a Sublease with Plaintiff Cold Stone Creamery Leasing dated November 30, 2003 (the "Lake Grove Sublease").  The Lake Grove Store opened for business on or about November 26, 2004.

7.     Defendant The Stone at Melville, Inc. is a New York Corporation with its principal place of business at 350 Route 110, Huntington Station, New York 11746.   At all times relevant to this action, The Stone at Melville, Inc. was the owner and operator of a Cold Stone Creamery franchise located at 350 Route 110, Huntington Station, New York 11746 (the "Huntington Station Store").  Defendant The Stone at Melville, Inc. was a franchisee for the Huntington Station Store pursuant to a Transfer Agreement dated October 15, 2003 (the "Huntington Station Transfer Agreement").   Defendant The Stone at Melville, Inc. is the

promisor for a Promissory Note dated January 1, 2005 entered into with Cold Stone Creamery, Inc. in the amount of $469,518.25, plus interest, for the purchase of equipment for the Huntington Station Store (the "Huntington Station Store Note"). The Huntington Station Store opened for business on or about October 20, 2004.

8.     Defendants Blue Ice Creamery, Inc., Starry Nights, Inc., The Stone at Lynbrook, Inc., Sparky's Delights, Inc., and The Stone at Melville, Inc. were all licensed to use the Cold Stone Creamery trademarks, trade name, and trade dress in accordance with the terms of the above-referenced Transfer Agreements.

9.     Defendant Marc Mandelbaum is a citizen of the State of New York. At all times relevant to this Complaint, Marc Mandelbaum was an owner and operator of all of the above-referenced Stores. He was also an owner and operator of Cold Stone Creamery franchises located at 1504 Old Country Road, Westbury, New York 11590 (the "Westbury Store"), 357 South Oyster Bay Road, Plainview, New York 11803 (the "Plainview Store"), and signed a Franchise Agreement to establish a store in Roslyn, New York (the "Roslyn Store"). Marc Mandelbaum was a franchisee for the Westbury Store pursuant to a Franchise Agreement dated September 15, 2004 (the "Westbury Franchise Agreement"). He was also a franchisee for the Plainview Store pursuant to a Franchise Agreement dated September 15, 2004 (the "Plainview Franchise Agreement") and for the Roslyn Store pursuant to a Franchise Agreement dated April 25, 2003 (the "Roslyn Franchise Agreement"). Defendant Marc Mandelbaum was a sublessee for the Westbury Store pursuant to a Sublease with Plaintiff Cold Stone Creamery Leasing dated February 28, 2003 (the "Westbury Sublease").

10.     Defendant Marc Mandelbaum is a shareholder and officer of Blue Ice Creamery, Inc. and is its only shareholder.  Defendant Marc Mandelbaum has a one hundred percent (100%) ownership interest in the corporation.  Defendant Marc Mandelbaum was a sublessee for the Huntington Store pursuant to a Sublease with Plaintiff Cold Stone Creamery Leasing dated April 10, 2003 (the "Huntington Sublease").

11.     Defendant Marc Mandelbaum is also a shareholder and officer of Starry Nights, Inc. and The Stone at Melville. Inc., and has fifty percent (50%) ownership interest in each corporation.  Defendant Marc Mandelbaum was a sublessee for the Woodbury Store pursuant to a Sublease with Plaintiff Cold Stone Creamery Leasing dated February 20, 2003 (the "Woodbury Sublease").

12.     Defendant Marc Mandelbaum is also a shareholder and officer of The Stone at Lynbrook, Inc. and Sparky's Delights, Inc., and has thirty-three and thirty-three hundredths percent (33.33%) ownership interest in each corporation.  In connection with the execution of the Huntington, Westbury, and Plainview Franchise Agreements, Defendant Marc Mandelbaum signed personal guarantees and agreed to perform any and all obligations under the contracts.  He also signed the Huntington Station and Plainview Store Notes.

13.     Defendant Marc Mandelbaum is also the promisor for a Promissory Note dated September 1, 2004 entered into with Cold Stone Creamery, Inc. in the amount of $119,773.14, plus interest, for the purchase of equipment for the Plainview Store (the "Plainview Store Note").

14.     Defendant Roy Mandelbaum is a citizen of the State of New York.  At all times relevant to this Complaint, Defendant Roy Mandelbaum was an owner and operator of the Lynbrook, Lake Grove, and signed a Franchise Agreement to establish the Roslyn Store.  He has twenty-five percent (25%) ownership interest in each of these Stores and their associated

corporations. In connection with the execution of the Roslyn Franchise Agreement, Defendant Roy Mandelbaum signed a personal guarantee and agreed to perform any and all obligations under the agreement.

15. Defendant Eric Levine is a citizen of the State of New York and resides in the County of Westchester. At all times relevant to this Complaint, Eric Levine was an owner and operator of the Westbury, Plainview, Woodbury, Lynbrook, Lake Grove, Roslyn and Huntington Station Stores. He has a fifty percent (50%) ownership interest in the Westbury, Plainview, Woodbury and Huntington Station Stores and their associated corporations. He has twenty-five percent (25%) ownership in the Lynbrook, Lake Grove, and Roslyn Stores and their associated corporations. In connection with the execution of the Westbury, Plainview, Lynbrook, and Roslyn Franchise Agreements, as well as the Woodbury Transfer Agreement, Defendant Eric Levine signed a personal guarantee and agreed to perform any and all obligations under the agreements. At all times relevant to this Complaint, Defendant Eric Levine was a sublessee for the Huntington Station Store pursuant to a Sublease with Plaintiff Cold Stone Creamery Leasing dated October 15, 2003 (the "Huntington Station Sublease").

16. Defendant Eric Levine is also the promisor for Plainview Store Note.

17. Defendant Karen Levine is a citizen of the State of New York and resides in the County of Westchester. Karen Levine is the wife of Eric Levine. At all times relevant to this Complaint, Defendant Karen Levine was a sublessee for the Huntington Station Store pursuant to the Huntington Station Sublease.

18. Defendant Amy Greenberg is a citizen of the State of New York. She is a shareholder of the Lynbrook, Lake Grove, and Roslyn Stores, and has a twenty-five percent (25%) ownership interest in each of the three Stores and their associated corporations. In

connection with the execution of the Lynbrook and Roslyn Franchise Agreements, and the Lake Grove Transfer Agreement, Defendant Amy Greenberg signed personal guarantees and agreed to perform any and all obligations under the contracts.

## VENUE AND JURISDICTION

19.     This Court has jurisdiction pursuant to §§ 34(a) and 39 of the Lanham Act, 15 U.S.C. §§ 1116(a) & 1121, and 28 U.S.C. §§ 1331, 1332, 1338, & 1367(a).  The amount in controversy exceeds $75,000, exclusive of interest and costs.

20.     Venue is properly in this District pursuant to 28 U.S.C § 1391(b).  Multiple Defendants reside in this District.

21.     This Court has *in personam* jurisdiction over Defendants, who reside in this District, and who engaged in the acts giving rise to the claims alleged in this case within this District.

## BACKGROUND

### The Cold Stone Creamery Franchise System

22.     Cold Stone Creamery is the franchisor of the Cold Stone Creamery franchise system, which was started in 1995.

23.     Cold Stone Creamery has the exclusive license to use and license others to use these marks and trade name and has used them continuously since approximately 1988 to identify its ice cream stores and the ice cream, cakes and other products associated with those stores.

24.     Cold Stone Creamery owns federal registrations for the mark "Cold Stone Creamery" and related marks.

25.    The Cold Stone Creamery trademarks and trade name are distinctive and famous and have acquired secondary meaning.

26.    The Cold Stone Creamery trademarks and trade name are utilized in interstate commerce.

27.    The Cold Stone Creamery marks have been very widely advertised and promoted by Cold Stone Creamery over the years.  Cold Stone Creamery and its franchisees have expended millions of dollars in advertising and promoting Cold Stone Creamery since 1995.

28.    Cold Stone Creamery and its franchisees currently operate approximately 1,450 stores in the United States and around the world.  Cold Stone Creamery stores feature the Cold Stone Creamery distinctive trade dress, color scheme, and lettering style.  In the ten years since the Cold Stone Creamery System began, millions of consumers have been served in Cold Stone Creamery stores.

29.    As a result of the extensive sales, advertising, and promotion of items identified by the Cold Stone Creamery marks, the public has come to know and recognize the Cold Stone Creamery marks and to associate them exclusively with products and services offered by Cold Stone Creamery and its franchisees.  The Cold Stone Creamery marks are widely known trademarks in the United States and are assets of value that is not able to be precisely calculated at this time, but because Cold Stone Creamery is a large franchisor of premium ice cream products, and widely known as a provider of these products, the value is substantial to Cold Stone Creamery, representing and embodying Cold Stone Creamery's considerable goodwill and favorable reputation.

**The Parties' Rights and Obligations Under the
Cold Stone Creamery Franchise Agreements**

30. Defendants were licensed to use the Cold Stone Creamery trademarks, trade name, and trade dress in accordance with the terms of the Franchise Agreements.

31. Under the terms of the Franchise Agreements, Defendants agreed to do certain things, including the following:

a) pay when due all debts and obligations in connection with the franchised businesses (*See, e.g.,* Lake Grove Franchise Agreement ¶ 7(p))

b) pay to Cold Stone Creamery royalties of six (6) percent of the net sales of the franchised businesses (*id.* at ¶ 9(b)(i));

c) pay to Cold Stone Creamery advertising fees of three (3) percent of the Gross Sales of the franchised businesses (*id.* at ¶ 9(c));

d) report their gross sales on a weekly basis (*id.* at ¶ 10(a));

e) authorize Cold Stone Creamery to draw funds against their bank accounts for royalties, advertising fees, and any other amounts owed (*id.* at ¶ 9(f));

f) pay interest and late fees on unpaid monies due (*id.* at ¶ 9(e)); and

g) comply with all applicable federal, state and local laws, regulations and ordinances in connection with the conduct of the Franchised Business (¶ 7(o);

32. The Franchise Agreements provide that the underreporting of Gross Sales by two percent (2%) or more during any calendar year constitutes "good cause" for termination. (*Id.* ¶ 16(g).)

33. The Franchise Agreements also contain acknowledgements and agreements by the Defendants concerning the use of the Cold Stone Creamery trademarks, including the following:

10

a)    that upon any breach of the Franchise Agreement with respect to the use of Cold Stone Creamery trademarks, Cold Stone Creamery may institute and prosecute court proceedings to obtain an injunction to enforce the Franchise Agreements and pursue "any other remedy to which Franchisor may be entitled" (*id.* at ¶ 8(i));

b)    that the trademark rights conveyed by the Franchise Agreement are "of a unique and special nature" (*id.*);

c)    that Cold Stone Creamery's remedy at law for any breach of the Franchise Agreement with respect to the use of Cold Stone Creamery's trademarks would be inadequate (*id.*); and

d)    that the franchisee would consent to the issuance of an injunction to enforce the provisions of the Franchise Agreement with respect to the use of Cold Stone Creamery's trademarks.  (*Id.*).

34.    The Franchise Agreements further provide that the breach of any of the above-referenced provisions is good cause for the termination of the contracts, as is the failure to repeatedly (three or more times) comply with any obligation under the agreements with Cold Stone Creamery and its affiliates.  (*Id.* ¶ 16.)

35.    In addition, the Franchise Agreements provide that the termination of one of the Franchise Agreements provides good cause for the termination of any other Franchise Agreements or Subleases between the parties.  (*Id.* ¶ 16(p).)  Similarly, Defendants agreed that Cold Stone Creamery has the right to terminate the Franchise Agreements upon termination of the Subleases.  (*Id.* ¶ 16(e)(i).)

36.     The Franchise Agreements are also terminable if the Franchisee conducts the business in a manner that may materially and adversely affect the goodwill and reputation of Franchisor, its products or the Service Mark, among other breaches.  (*Id.* ¶ 16.)

37.     The Franchise Agreements contain acknowledgements and agreements by Defendants concerning the continued use of Cold Stone Creamery's trademarks after the termination of the Franchise Agreements.  Defendants, for example, agreed that they must immediately cease to use the marks and that any unauthorized or continued use of the marks after termination would constitute irreparable harm subject to injunctive relief.  (*Id.* ¶¶ 17(a)(v), (c).)

38.     Defendants also agreed that Cold Stone Creamery would be entitled to its attorneys' costs and fees should it prevail in any court proceeding related to a claim arising out of the Franchise Agreements.  (*Id.* ¶ 32.)

## The Parties' Rights and Obligations Under the Subleases

39.     Under the terms of the Subleases, Defendants agreed to timely perform all of Sublessor Cold Stone Creamery Leasing's obligations under the Leases, including rental and other payments.  (*See, e.g.,* Lake Grove Sublease, ¶ 1(a)).  Defendants also agreed to pay all monies owed under the Subleases and Leases directly to the Landlords.  (*Id.*)

40.     Under the terms of the Subleases, Cold Stone Creamery Leasing has the right to terminate the Subleases at any time during their terms if Defendants defaulted on their obligations under the Subleases or Franchise Agreements.  (*Id.* ¶ 4).

41.     Defendants also agreed that Cold Stone Creamery Leasing would be entitled to its attorneys' fees and expenses should it prevail in any proceeding in connection with the

enforcement of its rights under the Subleases, and Defendants agreed to indemnify Plaintiff for all liabilities, costs, and expenses, including reasonable attorneys' fees, suffered in connection with the Lease.  (*Id.* ¶ 9.)

### The Parties' Rights and Obligations Under the Promissory Notes

42.     Defendants agreed to pay Plaintiff Cold Stone Creamery, in monthly installments, $469,518.25, plus interest, under the Huntington Station Store Note and $119,773.14, plus interest, under the Plainview Store Note.

43.     Pursuant to the terms of the Notes, Cold Stone Creamery has the right to declare the entire principal balance, plus all interest and any other fees, costs, and expenses owed under the Notes, immediately due and payable upon any default.

44.     Defendants further agreed that they would pay all costs of collection, including reasonable attorneys' fees and expenses upon any default.

### Defendants' Breaches of the Franchise Agreements, Subleases, and Promissory Notes

45.     Defendants have repeatedly failed to pay monies owed to Plaintiffs under their agreements with Plaintiffs, among other breaches.

46.     To date, Defendants owe, among other monies, approximately $57,000 in unpaid rent and miscellaneous expenses for the Woodbury Store; approximately $63,000 for unpaid rent, royalties, equipment, and miscellaneous expenses for the Lake Grove Store; approximately $73,000 for unpaid rent at the Huntington Station Store; and approximately $134,000 in unpaid rent and expenses for the Westbury Store.

47.     Similarly, Defendants have failed to make the required monthly installments or otherwise pay the monies owed under the Huntington Station and Plainview Store Notes.  To

date, they owe approximately $471,200 under the Huntington Station Note and $107,000 under the Plainview Note.

48.     As set forth above, under the Franchise Agreements, Defendants agreed to pay royalties and advertising fees on a weekly basis, as well as interest on unpaid monies due.  They failed to comply with these obligations.

49.     An investigation into Defendants' sales reporting practices and a review of Defendants' records have also revealed that they have also failed to accurately report all sales to Plaintiffs and to pay all fees owed on those sales.

50.     Upon discovering that Defendants had failed to accurately report their sales and failed to pay the monies due, Plaintiffs contacted Defendants Marc Mandelbaum and Eric Levine directly.

51.     Defendants admitted that they had knowingly and deliberately failed to accurately report sales and pay the royalties and advertising fees owed for at least four of the franchises. Defendants acknowledged that they owed Plaintiffs no less than: $6,969.51 in royalties and fees for the Westbury Store; $5,034.96 in royalties and fees for the Woodbury Store; $7,871.76 in royalties and fees for the Lake Grove Store; and $9,071.91 for the Huntington Station Store.

52.     Defendants have also knowingly, purposefully, and repeatedly breached the terms of their Franchise Agreements by, without limitation, violating applicable tax laws.

53.     Upon information and belief, Defendants participated in a scheme to avoid complying with applicable laws by, among other actions, failing to accurately report all sales and income to the IRS and the State of New York and, therefore, failing to pay all taxes due and owing.

54.    This conduct, by which, upon information and belief, the corporate Defendants filed false tax returns that misstated their actual income and expenses, constitutes a violation of federal and state tax laws and is good cause for terminating the Franchise Agreements pursuant to their "obey all laws" provisions.  At a bare minimum, this conduct violates 26 U.S.C. § 7201 (prohibiting the willful evasion of taxes), 26 U.S.C. § 7206 (criminalizing the willful preparation of tax returns with false material facts), and 18 U.S.C. § 1001 (making it a crime to knowingly and willfully falsify a material fact in any matter within the jurisdiction of the federal government).

**Termination of the Franchise Agreements and Subleases**

55.    Based on the foregoing, Defendants have repeatedly failed to pay monies owed and substantially comply with their obligations under the Franchise Agreements and Subleases. Their conduct constitutes grounds for the termination of the Franchise Agreements and Subleases.

56.    On or about July 6, 2006 and August 14, 2006, Plaintiffs sent Defendants notices of default for financial defaults, including monies owed for rent for the Westbury Store and note payments under the Huntington Station Note.  Defendants did not cure the breaches.

57.    On or about March 22, 2007, Plaintiffs sent Defendants notices of default for financial defaults of the Huntington Station Note; rent and other financial obligations under the Huntington Station Franchise Agreement and Sublease; rent and other financial obligations under the Lake Grove Franchise Agreement and Sublease; rent and other financial obligations under the Woodbury Franchise Agreement and Sublease; rent and other financial obligations under the Westbury Franchise Agreement and Sublease; and rent and other financial obligations under the Huntington Franchise Agreement and Sublease.

58.    Defendants did not cure the defaults.

59.    Based on the foregoing, and pursuant to the applicable provisions of the Franchise Agreements and Subleases, on July 20, 2007, Plaintiffs sent to Defendants a Notice of Default and Termination terminating each of the Franchise Agreements and Subleases stating the grounds for termination and demanding that they cease using Cold Stone Creamery's trade names and proprietary marks immediately upon the effective date of termination.  Plaintiffs further demanded that Defendants comply with their post-termination obligations under the Franchise Agreements and Subleases.  Defendants have refused to comply with the terms of the Notice of Default and Termination.

60.    Defendants' actions have caused and continue to cause irreparable harm to Plaintiffs, including harm to the reputation and goodwill of both brands.  Granting the requested injunctive relief would not harm any third parties and would advance the public interest.

### COUNT I
### (Breach of Franchise Agreements)

61.    The allegations of paragraphs 1 through 60 are hereby incorporated by reference.

62.    Defendants have repeatedly and consistently failed to pay when due all monies owed to Cold Stone Creamery in breach of their Franchise Agreements.

63.    Defendants have failed to provide Cold Stone Creamery access to their bank account for the purpose of collecting the monies owed.

64.    Defendants have failed to timely report sales to Cold Stone Creamery.

65.    Defendants have repeatedly defaulted under other agreements with Plaintiffs, including the Subleases and Promissory Notes in default of their Franchise Agreements.

66.    Upon information and belief, Defendants have failed to comply with all applicable laws, including federal income tax laws.  Such conduct is a material breach of the

16

Franchise Agreements, cannot be cured as a matter of law, and is cause for terminating the Franchise Agreements.

67.     On or about March 22, 2007, July 6, 2006, and August 14, 2006, Cold Stone Creamery sent Defendants notices of default for their financial defaults.

68.     Defendants failed to cure their defaults.

69.     On or about July 20, 2007, after Defendants' failed to cure, Cold Stone Creamery sent Defendants a notice of termination that terminated their Franchise Agreements for failure to pay monies owed under their agreements with Plaintiffs.  As part of the notice of termination, Cold Stone Creamery demanded that Defendants immediately comply with their post-termination obligations, which include Defendants' obligations to cease using Cold Stone Creamery's trademarks, copyrights, and proprietary information.

70.     Defendants continue to ignore Cold Stone Creamery's demand for payment of all past-due monies.

71.     Defendants continue to use Cold Stone Creamery's trademarks, trade name, and trade dress, and to operate their shops as if they were licensed Cold Stone Creamery franchisees.

72.     As a direct and proximate result of these breaches, Cold Stone Creamery has incurred substantial losses, fees, and expenses in an amount that has yet to be determined.

## COUNT II
### (Breach of Subleases)

73.     The allegations of paragraphs 1 through 72 are hereby incorporated by reference.

74.     Defendants have failed to pay when due all monies owed to Cold Stone Creamery under the Subleases.

75.     On or about August 14, 2006 and March 22, 2007, Cold Stone Creamery sent Defendants notices of default.

76.     Defendants failed to cure the defaults.

77.     On or about July 20, 2007, Cold Stone Creamery sent Defendants a notice of termination demanding that Defendants comply with their post-termination obligations, including paying all monies owed and delivering possession of the premises.

78.     Defendants have failed to comply with their post-termination obligations under the Subleases.

79.     As a direct and proximate result of these breaches, Cold Stone Creamery has incurred substantial losses, fees, and expenses in an amount that has yet to be determined.

### COUNT III
### (Breach of Promissory Notes)

80.     The allegations of paragraphs 1 through 79 are hereby incorporated by reference.

81.     Defendants have repeatedly failed to pay when due all monies owed to Cold Stone Creamery under the Promissory Notes.

82.     Defendants received notices of default for their failure to pay monies owed under the Notes.

83.     Defendants failed to pay the monies owed.

84.     As a direct and proximate result of these breaches, Cold Stone Creamery has incurred substantial losses, fees, and expenses in excess of $75,000.

### COUNT IV
### (Trademark Infringement)

85.     The allegations of paragraphs 1 through 84 are hereby incorporated by reference.

86.     Defendants' continued use of Cold Stone Creamery's proprietary marks to identify their stores after termination is likely to confuse or deceive the public into believing,

contrary to the fact, that Defendants' stores are licensed, franchised, sponsored, authorized or otherwise approved by Cold Stone Creamery, or are in some other way connected or affiliated with Cold Stone Creamery.  Such unlicensed use infringes Cold Stone Creamery's exclusive rights in the Cold Stone Creamery trademarks under § 32 of the Lanham Act, 15 U.S.C. § 1114.

87.    Defendants' acts were done knowingly and intentionally to cause confusion, or to cause mistake, or to deceive.

88.    As a result of the Defendants' infringement of the Cold Stone Creamery marks, Cold Stone Creamery has suffered and is continuing to suffer irreparable injury, and has incurred and is continuing to incur monetary damage in an amount that has yet to be determined.

### COUNT V
### (Trade Dress Infringement)

89.    The allegations of paragraphs 1 through 88 are hereby incorporated by reference.

90.    Defendants' stores are identified after termination by signs, exterior appearance, mansard roof, packaging, containers, and other items on which the words "Cold Stone Creamery" appear in the same lettering style and in the same distinctive color scheme that Cold Stone Creamery uses for the ice cream stores operated by Cold Stone Creamery's licensees.

91.    Defendants' use of the trade dress that is identical or confusingly similar to Cold Stone Creamery's trade dress constitutes a false designation of the origin of Defendants' stores, which is likely to cause confusion, or to cause mistake, or to deceive the public as to the affiliation, connection, or association of Defendants' stores with the Cold Stone Creamery ice cream stores operated by Cold Stone Creamery licensees.  Such adoption of Cold Stone Creamery's trade dress violates § 43 of the Lanham Act, 15 U.S.C. § 1125, and the common law.

92.    Defendants' acts were done knowingly and intentionally to cause confusion, or to cause mistake, or to deceive.

93.     As a result of the Defendants' infringement of Cold Stone Creamery's trade dress, Cold Stone Creamery has suffered and is continuing to suffer irreparable injury, and has incurred and is continuing to incur monetary damage in an amount that has yet to be determined.

## COUNT VI
### (Unfair Competition)

94.     The allegations of paragraphs 1 through 93 are hereby incorporated by reference.

95.     The unauthorized use in commerce of the trademark Cold Stone Creamery, as well as the unauthorized adoption of Cold Stone Creamery's distinctive trade dress, constitute a false designation of origin of Defendants' stores, which is likely to cause confusion, or to cause mistake or to deceive the public as to the affiliation, connection, or association of Defendants' stores with the Cold Stone Creamery ice cream stores operated by Cold Stone Creamery licensees, in violation of § 43 of the Lanham Act, 15 U.S.C. § 1125, and the common law.

96.     Defendants' acts were done knowingly and intentionally to cause confusion, or to cause mistake, or to deceive.

97.     As a result of Defendants' unfair competition, Cold Stone Creamery has suffered and is continuing to suffer irreparable injury, and has incurred and is continuing to incur monetary damage in an amount that has yet to be determined.

## PRAYER FOR RELIEF

WHEREFORE, Cold Stone Creamery and Cold Stone Creamery Leasing pray that this Court:

A.      Enter an order stating that Defendants' continued use and enjoyment of Cold Stone Creamery's trademark, trade name, and trade dress are in violation of the provisions of the Lanham Act, 15 U.S.C. §§ 1114 et. seq., and of the common law;

B.      Enter an order enjoining Defendants, by preliminary and permanent injunction,

from using Cold Stone Creamery's trademarks, service marks, trade name, trade dress, and from otherwise engaging in unfair competition with Cold Stone Creamery;

C.      Enter an injunctive order ratifying and enforcing the termination of the Franchise Agreements and Subleases *nunc pro tunc*;

D.      Enter an injunctive order directing Defendants to comply with their post-termination obligations under any contract between the parties including, but not limited to, the Franchise Agreements and the Subleases;

E.      Enter and order directing Defendants to surrender the leased premises and to pay Cold Stone Creamery Leasing the amount of any losses or damages it has suffered or may suffer by reason of the termination of the Subleases;

F.      Enter judgment in favor of Plaintiffs against Defendants for the damages incurred by Plaintiffs as a result of Defendants' actions;

G.      Award Cold Stone Creamery judgment against Defendants for the damages Cold Stone Creamery has sustained and the profits Defendants have derived as a result of their trademark infringement, or such damages the court deems just, that such damages be assessed in a separate accounting procedure and trebled in accordance with § 35 of the Lanham Act, 15 U.S.C. § 1117;

H.      Enter an order directing Defendants to account to Plaintiffs for all sales made and receipts earned during the term of the franchise relationship and the term of the Subleases;

I.      Award Cold Stone Creamery prejudgment interest in accordance with § 35 of the Lanham Act, 15 U.S.C. § 1117;

J.      Award Plaintiffs their costs and attorneys' fees incurred in connection with this action, pursuant to § 35 of the Lanham Act, 15 U.S.C. § 1117, and pursuant to the Franchise

Agreement, Subleases, and Promissory Notes, including the costs incurred in conducting any and all necessary inspections and audits;

      K.      Award Cold Stone Creamery exemplary or punitive damages against Defendants; and

      L.      Award Plaintiffs such other relief as this Court may deem just and proper.

Respectfully submitted,

By: /s/ Ronald D. Degen
Ronald Degen, Esq. (RD 7808)
Scott Goldfinger, Esq. (SC 9219)
O'ROURKE & DEGEN, PLLC
225 Broadway, Suite 715
New York, NY 10007
Telephone: (212) 227-4530
Facsimile: (212) 385-9813
E-mail: rdegen@odlegal.com

Robert L. Zisk, Esq. (RZ 1275)
Stephen J. Vaughan, Esq. (SJ 2990)
GRAY, PLANT, MOOTY, MOOTY
  & BENNETT, P.A.
2600 Virginia Avenue, N.W., Suite 1111
Washington, DC 20037
Telephone: (202) 295-2200
Facsimile: (202) 295-2250

*Attorneys for Plaintiffs*
Cold Stone Creamery, Inc. and
Cold Stone Creamery Leasing Company, Inc.

Dated: July 25, 2007